UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Martin Beninson</u>

   v.          Case No. 17-cv-371-PB

<u>Nancy A. Berryhill, Acting</u>
<u>Commissioner, Social</u>
<u>Security Administration</u>

**<u>REPORT AND RECOMMENDATION</u>**

   Martin Beninson moves to reverse the decision of the Acting Commissioner of the Social Security Administration ("SSA") to deny his applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382.  The Acting Commissioner moves for an order affirming her decision.  For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ") should be affirmed.

**I. Scope of Review**

   The scope of judicial review of the Acting Commissioner's decision is as follows:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out standard of review for decisions
on claims for DIB); see also 42 U.S.C. § 1383(c)(3) (applying §
405(g) to SSI decisions).  However, the court "must uphold a
denial of social security disability benefits unless 'the
[Acting Commissioner] has committed a legal or factual error in
evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS,
76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v.
Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an
applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than
> it might sound to the lay ear: though certainly "more
> than a scintilla" of evidence is required to meet the
> benchmark, a preponderance of evidence is not.  Bath
> Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51,
> 56 (1st Cir. 2003) (internal quotation marks omitted).
> Rather, "[a court] must uphold the [Acting
> Commissioner's] findings . . . if a reasonable mind,
> reviewing the evidence in the record as a whole, could
> accept it as adequate to support [her] conclusion."
> Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d
> 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "the resolution of conflicts in the evidence
and the determination of the ultimate question of disability is
for [the Acting Commissioner], not for the doctors or for the
courts."  Id. (quoting Rodriguez, 647 F.2d at 222).  Thus, the

court "must uphold the [Acting Commissioner's] conclusion, even
if the record arguably could justify a different conclusion, so
long as it is supported by substantial evidence." Tsarelka v.
Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

The parties have submitted a Joint Statement of Material
Facts ("Joint Statement").  That statement, document no. 15, is
part of the court's record and is summarized here, not repeated
in full.

Beninson applied for DIB and SSI in September of 2013.  He
claimed that he was disabled by depression, anxiety, anemia,
reflux, and allergies.

The SSA's regulations include a list of physical and mental
conditions that are per se disabling.  Each individual listing
includes a set of criteria that a condition must meet in order
to qualify as a disabling or "listing-level" impairment.  In
those regulations, affective disorders are Listing 12.04;
anxiety related disorders are Listing 12.06; and substance
addiction disorders are Listing 12.09.  See 20 C.F.R. Pt. 404,
Subpt. P, App. 1.[1]  Listings 12.04 and 12.06 each have three

---

[1] The court uses the listings that were in effect when the
ALJ made his decision, not the new ones that went into effect in
January of 2017.  See Skidmore v. Berryhill, No. 6:17-cv-99-JMH,
2018 WL 1831317, at *5 (E.D. Ky. Apr. 17, 2018).

paragraphs of criteria, paragraphs A, B, and C.  Listing 12.09, in turn, incorporates the criteria of nine different listings, including Listings 12.04 and 12.06.

At the initial level of review, and on reconsideration, the SSA determined that: (1) Beninson's affective disorder did not satisfy the paragraph A, B, or C criteria of Listing 12.04; and (2) his anxiety related disorder did not satisfy the paragraph A, B, or C criteria of Listing 12.06.  That led to an additional determination that Beninson's substance addiction disorder did not satisfy Listing 12.09.

Beninson has a long history of substance abuse, but, with one exception, he has been drug free since 2013.  The one exception was a suicide attempt in June of 2015, which involved an intentional drug overdose, revival by means of Narcan, and a four-hour visit to the emergency room.  A provider note resulting from that visit states, in pertinent part: "Patient was found to be abusing heroin, cocaine.  Responded well to a single dose of Narcan.  Remainder of his evaluation is reassuring.  He was observed for a period of time and then discharged with an adult sober friend."  Tr. 1538.

On June 29, 2015, eight days after his suicide attempt, Beninson saw his primary-care provider, Dr. Leena Kamat.  In a progress note, Dr. Kamat: (1) reported that Beninson was no

longer suicidal; (2) diagnosed him with depression and anxiety;
and (3) referred him to a psychiatrist, Dr. David Guggenhiem.
Dr. Guggenheim also saw Beninson on June 29.  He wrote a
progress note that includes the following assessment:

> [O]riented to time, place, person.  Mood Depressed.
> Affect Flat.  Speech Normal.  Thought Process Intact.
> Judgment Intact.  Insight Intact.  Suicidal Concern
> Denies.  Homicidal Concern Denies.  Medication
> Compliance Yes.

Tr. 1470.  In addition, Dr. Guggenheim noted: "Client was
appropriately dressed and groomed and made appropriate eye
contact.  He was cooperative and answered questions in an open
and honest manner."  Id.

About a month after his suicide attempt, Beninson received
his hearing before the ALJ.  At the hearing, the ALJ agreed to
hold the record open to allow Beninson to submit medical records
that resulted from treatment he had received after his overdose.
In his decision, the ALJ stated that "[d]espite [being] provided
many opportunities . . . to submit further evidence post-
hearing, the [claimant's] representative failed to provide any
additional records."  Tr. 25.  Beninson has provided the court
with evidence tending to show that he did submit additional
medical records to the ALJ in a timely fashion.

In any event, after the hearing, the ALJ issued a written
decision.  In it, he determined that claimant had no severe

physical impairments, but had three severe mental impairments, bipolar disorder, post-traumatic stress disorder, and substance abuse disorder.  Next, he determined that none of claimant's impairments, either alone or in combination, met or medically equaled the severity of any of the impairments on the SSA's list of impairments that are per se disabling.  Accordingly, the ALJ went on to assess Beninson's residual functional capacity ("RFC"),[2] and determined that he could "perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: [he] is limited to frequent interaction with supervisors, coworkers, and the public, and to following simple instructions and routine, repetitive tasks."  Tr. 32.  After finding that claimant's mental RFC precluded him from doing his former work, the ALJ found that his mental limitations had "little or no effect on the occupational base of unskilled medium work," Tr. 37, and, therefore, determined that claimant was not under a disability from September 30, 2013, through the date of his decision, which was December 2, 2015.

---

[2] "[R]residual functional capacity 'is the most [a claimant] can still do despite [his or her] limitations.'" Purdy, 887 F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation that applies to claims for SSI that is worded identically to 20 C.F.R. § 404.1545(a)(1), which applies to claims for DIB) (brackets in the original).

Beninson appealed the ALJ's adverse decision to the SSA Appeals Counsel.  The Appeals Council accepted the evidence that Beninson had tried to place before the ALJ.  But, it denied Beninson's request for review, explaining that the new evidence did "not show a reasonable probability that it would change the outcome of the [ALJ's] decision."  Tr. 2.

### III. Discussion

<u>A. The Legal Framework</u>

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The question in this case is whether the ALJ correctly decided that Bennison was not under a disability between May 30, 2013, and December 2, 2015.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process.  <u>See</u> 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe

> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5

(1st Cir. 2001); citing 20 C.F.R. § 416.920).

At the first four steps in the sequential evaluation

process, the claimant bears both the burden of production and

the burden of proof.  See Purdy, 887 F.3d at 9 (citing Freeman

v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen

v. Yuckert, 482 U.S. 137, 146 (1987).  He must prove he is

disabled by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[3]  Finally,

when

> assessing a disability claim, the [Acting
> Commissioner] considers objective and subjective
> factors, including: (1) objective medical facts; (2)
> [claimant]'s subjective claims of pain and disability
> as supported by the testimony of the [claimant] or

---

[3] At step five, the burden shifts to the Acting Commissioner
to identify jobs that the claimant can still perform, see
Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y of HHS, 670 F.2d
374, 375 (1st Cir. 1982)), but the Acting Commissioner's step-
five determination is not at issue here, so there is no need to
describe the mechanics of step five.

other witness; and (3) the [claimant]'s educational
background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

### B. Beninson's Claims

Beninson claims that the ALJ erred by: (1) failing to give
proper weight to the findings and conclusions of his providers
of mental-health treatment; (2) failing to give proper weight to
his episode(s) of decompensation; (3) finding that his
degenerative disc disease was not a severe impairment; (4)
finding that his statements about his symptoms were not entirely
credible; and (5) finding that his counsel failed to submit
supplemental medical information.  Beninson does not, however,
challenge the Appeals Council's decision not to review the ALJ's
decision.  Be that as it may, Bennison has identified no basis
for reversing the ALJ's decision or remanding this matter.

### 1. Treating Provider Findings

Beninson's first claim is that the ALJ committed reversible
error by "fail[ing] to give proper weight to the findings and
conclusions of [his] mental health practitioners."  Cl.'s Mem.
of Law (doc. no. 11) 2.  Like the Acting Commissioner, the court
construes Beninson's first claim as a challenge to the ALJ's
determination, at step 3 of the sequential evaluation process,

that he did not have a mental impairment that met or medically
equaled the severity of a listed impairment.

At step 3, the ALJ determined that Beninson did not have a
listing-level mental impairment because: (1) his affective
disorder did not satisfy the paragraph B or C criteria of
Listing 12.04; and (2) his anxiety related disorder did not
satisfy the paragraph B or C criteria of Listing 12.06.
Beninson challenges those determinations by: (1) citing evidence
from the record, including patient history, clinical
observations, diagnoses, and treatment suggestions; and (2)
arguing that the ALJ's step 3 determinations are not supported
by substantial evidence because the ALJ did not give sufficient
weight to the evidence he cited in his memorandum.   In the
analysis that follows, the court considers in turn the ALJ's
determinations that Beninson did not have a listing-level
affective disorder or a listing-level anxiety related disorder.[4]

### a. Affective Disorders

For an affective disorder to meet Listing 12.04, it must
satisfy paragraphs A and B of the listing, or it must satisfy

---

[4] The ALJ also determined that Beninson did not have a
listing-level substance addiction disorder, but because the
criteria for Listing 12.09 incorporate the criteria for Listings
12.04 and 12.06, no separate analysis of the ALJ's Listing 12.09
determination is necessary.

paragraph C.  To satisfy paragraph B, an affective disorder must

result in at least two of the following:

> 1. Marked restriction of activities of daily
> living; or
>
> 2. Marked difficulties in maintaining social
> functioning; or
>
> 3. Marked difficulties in maintaining
> concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of
> extended duration.

Listing 12.04B.  As for the first three criteria, the regulation

that governs the SSA's evaluation of mental impairments

establishes a five-point scale for rating the degree of a

claimant's limitation: "none, mild, moderate, marked, and

extreme."  20 C.F.R. §§ 404.1520a(c)(4) & 416.920a(c)(4).

In his decision, the ALJ found that Beninson had mild

restrictions on his activities of daily living, mild

difficulties in social functioning, and moderate difficulties in

maintaining concentration, persistence or pace.  See Tr. 30-31.

He supported those findings with ample citations to the record,

including Beninson's own testimony and reports he had made to

various health-care providers.  Among other things, the ALJ

cited evidence that Beninson volunteered at a food bank and a

soup kitchen, attended church functions twice a week, drove

daily, went on an extended vacation, was planning a hiking trip

11

to the Adirondacks, and was working at a part-time job that he had found and applied for on his own.  Thus, the ALJ's findings are supported by substantial evidence, see Purdy, 887 F.3d at 13, and Beninson does not argue to the contrary.  Because an affective disorder must result in two of the four paragraph B conditions if it is to satisfy paragraph B, and the ALJ supportably found that Beninson's affective disorder did not result in any of the first three conditions, his determination that Beninson's affective disorder did not satisfy the paragraph B criteria is supported by substantial evidence.

Because the ALJ did not err in his determination that Beninson's affective disorder did not satisfy the paragraph B criteria, the only way that Beninson could have been found to have had a listing-level affective disorder is if his impairment satisfied the paragraph C criteria.  These are the paragraph C criteria:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual
to decompensate; or

     3. Current history of 1 or more years' inability
to function outside a highly supportive living
arrangement, with an indication of continued need for
such an arrangement.

Listing 12.04C.  As for the first paragraph C criterion, which
is also the fourth paragraph B criterion, "[t]he term repeated
episodes of decompensation, each of extended duration . . .
means three episodes within 1 year, or an average of once every
4 months, each lasting for at least 2 weeks."  Listing 12.00C.4
(emphasis in the original).

     In his decision, the ALJ determined that "[t]he evidence of
record demonstrates [that] the paragraph 'C' criteria have not
been satisfied."  Tr. 31.  The evidence the ALJ cited in support
of his finding on the paragraph B criteria is also substantial
evidence that Beninson's affective disorder was not severe
enough to satisfy either the second or the third of the
paragraph C criteria.  The ALJ cited substantial evidence that
Beninson was relatively active in the community, not on the
brink of decompensation, see Listing 12.04C.2, or in need of a
highly supportive living arrangement, see Listing 12.04C.3.
Beninson does not argue that the ALJ's decision was not
supported by substantial evidence.  Instead, he identifies
evidence that, in his view, supports his position.  But, the

court can see nothing in the evidence that Beninson cites that
contradicts the ALJ's finding.  But more importantly, it is well
established that "the resolution of conflicts in the evidence .
. . is for [the Acting Commissioner], not for the . . . courts."
Purdy, 887 F.3d at 13.  Thus, if the ALJ erred in his
determination that Beninson's affective disorder did not satisfy
the paragraph C criteria of Listing 12.04, he would have done so
by erroneously determining that Beninson's affective disorder
did not satisfy the first paragraph C criterion, repeated
episodes of decompensation, each of extended duration.

     In his discussion of the paragraph B criteria, which also
include repeated episodes of decompensation, each of extended
duration, the ALJ had this to say:

> As for episodes of decompensation, the claimant has
> experienced one or two episodes of decompensation,
> each of extended duration.  Episodes of decompensation
> are exacerbations or temporary increases in symptoms
> or signs accompanied by a loss of adaptive
> functioning, as manifested by difficulties in
> performing activities of daily living, maintaining
> social relationships, or maintaining concentration,
> persistence, or pace.  The undersigned has examined
> all the evidence and finds no evidence of episodes of
> decompensation.

Tr. 31.  In a section of his memorandum devoted exclusively to
the way the ALJ addressed decompensation, Beninson correctly
notes the internal inconsistency in the paragraph quoted above
and further argues that the ALJ erred by failing to give any

weight to his June 21, 2015, suicide attempt, which he
characterizes as evidence of an episode of decompensation.

Plainly, Beninson's June 21, 2015, suicide attempt was
evidence of an episode of decompensation. See Listing 12.00C.4
(defining "episodes of decompensation"). The ALJ devoted a full
paragraph of his decision to that episode. See Tr. 34. In that
paragraph, he described Beninson's visits to Drs. Kamat and
Guggenheim on June 29, 2015, and described their reports of
Beninson's relatively normal presentation. That, in turn, is
substantial evidence that Beninson's June 2015 episode of
decompensation did not last long enough to meet the two-week
durational requirement established in the listings. See Ramos
Rivera v. Colvin, Civ. No. 15-1768 (CVR), 2016 WL 4094868, at *4
(D.P.R. Aug. 2, 2016) (affirming ALJ's finding that durational
requirement was not satisfied by suicide attempt, followed by
eight-day hospitalization, where claimant, upon discharge, "was
found to be active, alert and oriented, stabilized, coherent and
relevant and cooperative").

Moreover, there appears to be no evidence to support a
finding that Beninson suffered enough episodes of decompensation
over a short enough span of time to satisfy the frequency
requirement, i.e., "three episodes within 1 year, or an average
of once every 4 months," Listing 12.00C.4. Beninson does not

address the durational requirement in his memorandum, and the

Joint Statement identifies, at the most, two episodes of

decompensation, the June 2015 suicide attempt and a drug binge

in March of 2013 that resulted in an emergency-room visit.  So,

notwithstanding the ALJ's erroneous statement that the evidence

shows "no evidence of episodes of decompensation," Tr. 31, his

determination that Beninson's affective disorder did not satisfy

the paragraph B criteria is supported by substantial evidence.

Because the ALJ's findings that Beninson's affective

disorder did not satisfy either the paragraph B or C criteria of

Listing 12.04 are supported by substantial evidence, his

determination that Beninson did not have a listing-level

affective disorder provides no basis for reversal or remand.

### b. Anxiety Related Disorders

For an anxiety related disorder to meet Listing 12.06, it

must satisfy paragraphs A and B of the listing, or it must

satisfy paragraphs A and C.  In light of the foregoing

discussion of the ALJ's handling of the paragraph B criteria,

all that remains is to consider his handling of the paragraph C

criteria, which are: "complete inability to function

independently outside the area of one's home," Listing 12.06C.

In his decision, the ALJ determined that "[t]he evidence of

record demonstrates that the paragraph 'C' criteria have not

been satisfied." Tr. 31.  Beninson makes no argument to the
contrary, and, indeed, the ALJ's discussion of the paragraph B
criteria mentions Beninson's testimony concerning a wide range
of activities he engaged in outside his home.  Thus, substantial
evidence supports the ALJ's determination that Beninson's
anxiety related disorder did not satisfy the paragraph C
criteria of Listing 12.06.  Thus, as with Listing 12.04, the
ALJ's determination that Beninson did not have a listing-level
anxiety related disorder provides no basis for reversal or
remand.

### 2. Decompensation

Beninson's second claim of error is that the ALJ did not
properly factor his June 21, 2015, suicide attempt into his
consideration of decompensation.  As the court explained in the
previous section, the ALJ committed no error in his
consideration of decompensation.  Accordingly, Beninson's second
claim provides no basis for reversing the ALJ's decision or
remanding this matter.

### 3. Degenerative Disc Disease

Beninson's third claim is that the ALJ erred by failing to
find that his degenerative disc disease was a severe impairment,
at step 2 of the sequential evaluation process.  While the ALJ
did determine that Beninson's degenerative disc disease was not

a severe impairment, he also went past step 2 and expressly stated that when assessing Beninson's RFC, he "considered the functional limitations resulting from all of the claimant's medically determinable impairments, including those that are nonsevere," Tr. 29 (citing 20 C.F.R. §§ 404.1545 & 416.945). And, indeed, the ALJ limited Beninson to medium exertional work, specifically because of his nonsevere degenerative disc disease. See id.

Because the ALJ proceeded past step 2, even if he erred by failing to find that Beninson's degenerative disc disease was a severe impairment, any error was harmless. See Champine v. Berryhill, No. 16-cv-539-PB, 2018 WL 345843, at *4 (D.N.H. Jan. 10, 2018) ("when an ALJ errs at step two by failing to determine that an impairment is severe, that error typically 'is harmless as long as the ALJ considered that impairment in assessing [the claimant's] residual functional capacity at step four'") (quoting Gruhler v. Berryhill, No. 17-cv-208-JD, 2017 6512227, at *6 (D.N.H. Dec. 20, 2017); citing Delia v. Comm'r of Soc. Sec., 433 F. App'x 885, 887 (11th Cir. 2011); Fortin v. Colvin, No. 3:16-cv-30019-KAR, 2017 WL 1217117, at *10 (D. Mass. Mar. 31, 2017)). And a harmless error provides no basis for a remand. See Cassidy v. Berryhill, 17-cv-451-SM, 2018 WL 1157761, at *5 (D.N.H. Mar. 5, 2018) (denying relief where

claimant had "not shown any prejudice from [the ALJ's] error") (citing Shineski v. Sanders, 556 U.S. 396, 409 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000) ("While an error of law by the ALJ may necessitate a remand . . . a remand is not essential if it will amount to no more than an empty exercise.").

Beninson also asserts that he has been diagnosed with fibromyalgia and that the ALJ committed reversible error by overlooking that impairment in his decision.  However, while Beninson mentioned fibromyalgia at his hearing, see Tr. 82, his memorandum of law does not cite to any evidence in the record to support his assertion that he "has been diagnosed as having fibromyalgia," doc. no. 11, at 7, and the Joint Statement does not mention fibromyalgia in the section devoted to Beninson's physical impairments, see doc. no. 15, at 16-17.  Thus, the ALJ did not err by failing to consider the effects of fibromyalgia on Beninson's RFC.

In short, Beninson's third claim provides no basis for reversing the ALJ's decision or remanding this matter.

<u>4. Credibility</u>

Beninson's fourth claim is that the ALJ improperly assessed the credibility of statements he made about the intensity, persistence, and limiting effects of the symptoms of his impairments.

The applicable Social Security Ruling ("SSR") in force when the ALJ made his decision on Beninson's applications explained that the Social Security "regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).[5] The SSR goes on to describe that process:

> * First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. . . . If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> * Second, once an underlying physical or mental impairment(s) that could reasonably be expected to

---

[5] SSR 96-7p was superseded by SSR 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016), but did not go into effect until March 16, 2016, several months after the ALJ made his decision in this case.

produce the individual's pain or other symptoms has
been shown, the adjudicator must evaluate the
intensity, persistence, and limiting effects of the
individual's symptoms to determine the extent to which
the symptoms limit the individual's ability to do basic
work activities.  For this purpose, whenever the
individual's statements about the intensity,
persistence, or functionally limiting effects of pain
or other symptoms are not substantiated by objective
medical evidence, the adjudicator must make a finding
on the credibility of the individual's statements based
on a consideration of the entire case record.

Id. (footnote omitted).

The problem for Beninson arises in his application of the

analytical scheme outlined in SSR 96-7p.  In reliance upon the

underlined sentence in the paragraph describing the second step

in the process, Beninson claims that the ALJ erred by assessing

the credibility of his statements after he had determined that

those statements were substantiated by objective medical

evidence.  While courts have explained that "[t]he lack of

objective medical evidence supporting a claimant's statements

about [his] symptoms is what triggers an ALJ's obligation to

conduct a credibility assessment," Morris v. Colvin, No. 12-cv-

280-JL, 2013 WL 2455975, at *3 (D.N.H. June 6, 2013) (citing

Clavette v. Astrue, No. 10-cv-580-JL, 2012 WL 472757, at *9

(D.N.H. Feb. 7, 2012)), Beninson has provided no authority for

the proposition that an ALJ commits reversible error by

performing a seemingly unnecessary credibility analysis after

finding that a claimant's statements are supported by objective

medical evidence.  But, more importantly, the ALJ did not do
what Beninson accuses him of.  Beninson identifies no point in
the ALJ's decision at which the ALJ said that Beninson's
statements about his symptoms were substantiated by objective
medical evidence, and the court can find no such statement by
the ALJ.

Rather, the ALJ accurately described the applicable
analytical framework, see Tr. 32, and correctly applied it.
Specifically, the ALJ: (1) found "that the claimant's medically
determinable impairments could reasonably be expected to cause
the alleged symptoms," Tr. 33; (2) devoted a paragraph to
discussing the objective medical evidence, without saying that
the evidence substantiated Beninson's statements about his
symptoms, see id.; and (3) concluded with a discussion that
touched on many of the so-called Avery factors, which are used
to assess the credibility of a claimant's statements about his
symptoms, see Montrose v. Berryhill, No. 17-cv-148-SM, 2017 WL
6767238, at *6-7 (D.N.H. Dec. 14, 2017) (citing, inter alia,
Avery, 797 F.2d at 29; 20 C.F.R. §§ 404.1529(c)(3) &
416.929(c)(3)).

Beninson does not challenge the ALJ's application of the
Avery factors.  Instead, in support of his claim that "the ALJ .
. . erred by conducting a flawed analysis of the record

evidence," Cl.'s Mem. of Law (doc. no. 11) 8, Beninson
criticizes the way the ALJ weighed the opinions provided by
various medical sources.  But, with one exception, he does not
frame those criticisms in terms of the regulations that govern
the SSA's evaluation of medical opinions, see 20 C.F.R. §§
404.1527(c) & 416.927(c), which is probably enough to warrant
the rejection of those criticisms without further discussion,
see Olmos-Colaj v. Sessions, 886 F.3d 168, 176 (1st Cir. 2018)
("It is settled beyond peradventure that theories advanced in
skeletal form, unaccompanied by developed argumentation, are
deemed abandoned.") (quoting Xue Deng Jiang v. Gonzales, 474
F.3d 25, 32 (1st Cir. 2007)).

However, even if Beninson's criticisms of the ALJ's
evaluation of the medical opinions do merit attention, they are
unpersuasive.  First, Beninson argues that the ALJ contradicted
himself by giving great weight to Dr. Abraham Bernstein's
opinion that he "did not have any severe physical impairments,"
Tr. 35, but subsequently finding that he "had three severe
impairments," Cl.'s Mem. of Law (doc. no. 11) 9.  But, Dr.
Bernstein opined that Beninson had no severe physical
impairments, while the ALJ concluded that Beninson had three
severe mental impairments.  So, there is nothing in the ALJ's
step 2 finding that is inconsistent with giving great weight to

23

Dr. Bernstein's opinion.  Next, Beninson criticizes the ALJ for giving too little weight to an opinion from a non-treating non-examining source that actually undermines his claim, i.e., Dr. Cory Sells' opinion that he did not have a severe mental impairment.  It is difficult to see how Beninson could have been harmed by a decision that gave too little weight to an unfavorable medical opinion.  Finally, Beninson criticizes the ALJ for giving only "some weight" to an opinion from two treating sources that he had a moderate impairment of his capacity for attention and concentration due to anxiety.  See Tr. 703.  But in his decision, the ALJ found that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties."  Tr. 31.  So it would appear that the ALJ adopted exactly the opinion that Beninson faults him for discounting.

To sum up, Beninson has identified no reversible error in the ALJ's credibility assessment and, therefore, his fourth claim of error provides no basis for remanding this matter.

### 5. Supplemental Medical Information

At Beninson's hearing, the ALJ agreed to hold the record open so that Beninson could submit records from his primary-care provider, Dr. Kamat, that were generated after his suicide attempt on June 21, 2015.  Beninson's fifth claim arises from the ALJ's statement that "[d]espite [being] provided many

24

opportunities by the undersigned to submit further evidence post-hearing, the [claimant's] representative failed to provide any additional records." Tr. 25. Beninson says, with evidentiary support, that his representative did submit the evidence at issue to the ALJ in a timely fashion, and claims that the matter should be remanded to allow the ALJ to consider that evidence. The court does not agree.

The problem with Beninson's fifth claim is that he does not say how he was prejudiced by the ALJ's failure to consider the evidence at issue. Even if he had attempted to demonstrate prejudice, he would not have been able to do so. The court has already described two progress notes, one by Dr. Kamat and one by Dr. Guggenheim, that were written eight days after Beninson's suicide attempt. Rather than undermining the ALJ's decision, those progress notes support the ALJ's decision, by establishing that Beninson's June 2015 episode of decompensation did not satisfy the requisite durational requirement. And there is nothing else in those records that contradicts the ALJ's decision or that would have supported a more favorable one. So, the ALJ's failure to consider those medical records was, at worst a harmless error, which would make remand an empty exercise and unwarranted. See Ward, 211 F.3d at 656; Cassidy, 2018 WL 1157761, at *5.

## IV. Conclusion

Because the ALJ committed neither a legal nor a factual error in evaluating Beninson's claim, see Manso-Pizarro, 76 F.3d at 16, his motion for an order reversing the Acting Commissioner's decision, document no. 10, should be denied, the Acting Commissioner's motion for an order affirming her decision, document no. 13, should be granted, and the clerk of the court should be directed to enter judgment in favor of the Acting Commissioner and close the case.

Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). The 14-day period may be extended upon motion. Failure to file a specific written objection to the Report and Recommendation within the specified time waives the right to appeal the district court's order. See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016); Fed. R. Civ. P. 72(b)(2).

Andrea K. Johnstone
United States Magistrate Judge

February 4, 2019

cc:  All Counsel of Record